The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Edward Garner, Jr. and the briefs on appeal to the Full Commission. Based upon his assignments of error, plaintiff has not shown good ground to receive further evidence or to amend the holding of the prior Opinion and Award. However, pursuant to its authority under N.C. Gen. Stat. § 97-85, the Full Commission modifies in part, and affirms in part, the prior Opinion and Award and enters the following Opinion and Award.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 12 December 1996 as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff-employee and defendant-employer at all relevant times herein.
3. Plaintiff's disability began on 16 October 1993.
***********
Based upon the evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing on 12 December 1996, plaintiff was 53 years old. Plaintiff graduated from Durham High School in 1962.
2. At age 20, plaintiff went to cosmetology school for approximately one year and then began working in a hair salon. Since that time, plaintiff has worked continuously in a hair salon through 16 October 1993.
3. Plaintiff owned and operated her own hair salon, "Hair By Design," hereinafter referred to as defendant-employer. In the course of her employment with defendant-employer, plaintiff's job duties included: shampooing, cutting, coloring and designing hair. Plaintiff also worked with wigs and performed hot facial waxes.
4. In the course of performing her duties for defendant-employer, plaintiff used all of the following brand name products: Nexxus; Goldwell; Joico; Fermadal; Redken; Wella; Clairol; Paul Mitchell; Aveda; L'Oreal, and; Matrix.
5. Redken products used by plaintiff contained the following substances and chemicals: ethanol; phenylene diamine; aminophenol; isopropyl alcohol; pyrogalic acid; chloro-phenylenediamine sulfate; dihydroxynaphthalene; chlororesorcinol; zinc pyrithione; epichlorohydrin; hydrogen peroxide; glycerol monothioglycolate; thioglycolic acid; ammonia; methylene chloride; isobutane; propane; amino-2 hydroxytoluyene; acrylic acid; benzene; sodium silicate; sodium metacylicate; potassium persulfate; ammonium persulfate; sodium persulfate; cocoamphoglycinate; bio-terge; triton; methylochloroisothiazolinone; methylisothiazolinone; chloroallyl methanamine chloride, and; epichlorohydrin.
6. Clairol products, creams, gels, aerosols, hair dye, dye removers and mousse, used by plaintiff contained the following substances and chemicals : mineral oil; SD alcohol-40; PPG-40; butylether; glycerin; propylene glycol; beeswax; lauramide DEA; sodium oleth-7 phosphate; PEG-150; sodium laureth-4; polysorbate 20; sorbitan stearate; PPG-24-glycereth-24; polyquaternium-16; PEG 150 distearate; hydroxyethylcellulose; hydroxypropyl methyl cellulose; PPG 10 glyceryl soyatrimonium chloride; chitosan; dimethicone copolyol; fragrance; PPG-12; PEG 65; lanolin oil; isopropyl alcohol; laureth-23; sulfate castor oil; propylene glycol; salicylic acid, and; triathenolamine.
7. In 1993, plaintiff began to develop numerous unexplained symptoms, which included: burning and watery eyes; pain and burning in her sinus and nasal passages; headaches; ringing in the ears; swollen lips and throat; shortness of breath; chest pain; nausea, upset stomach and diarrhea; shoulder and neck stiffness; drowsiness; disorientation; achy joints; chronic fatigue; frequent urination; patches of redness on her skin; swelling in her legs and ankles; pain and numbness in her legs; short attention span; the inability to focus; memory loss, and dizziness.
8. Dr. James Kelly, a general practitioner and plaintiff's personal physician, initially diagnosed plaintiff's headaches as being caused by allergies. Based on plaintiff's symptoms, Dr. Kelly advised plaintiff to stop working in her job with defendant-employer. Dr. Kelly also identified plaintiff as suffering from profound short-term memory loss on 21 October 1993. Plaintiff has not worked in any capacity for any employer since 16 October 1993.
9. In a letter dated 17 January 1994, Dr. David L. Williamson, plaintiff's chiropractor opined that severe neck pain and headaches could be related to exposure to chemicals. Dr. Williamson first treated plaintiff for back and neck pain and stiffness resulting from tension related to a family crisis on 11 December 1988.
10. From 15 November 1993 through 1 December 1993, plaintiff was treated by Dr. Brett Burquest, an ear nose and throat specialist, who diagnosed plaintiff as being sensitive to hair salon chemicals.
11. Plaintiff was then examined by Dr. Leon Geary at Durham Chest and Allergy Associates on 23 December 1993. Dr. Geary diagnosed plaintiff as having multiple chemical sensitivities.
12. Next, plaintiff began treatment with Dr. Allan Lieberman in April of 1995. Dr. Lieberman has opined that plaintiff's employment placed her at an increased risk of developing multiple chemical sensitivities and toxicity when compared to members of the general public. Dr. Lieberman was also of the opinion that plaintiff's employment significantly contributed to the development of her multiple chemical sensitivities, toxicology and chronic sinusitis. Dr. Lieberman also diagnosed plaintiff as suffering from cacosmia, which is a heightened sensation of odors. It is Dr. Lieberman's opinion that cacosmia is highly characteristic and sometimes almost pathognomonic of patients who have had toxic chemical injuries.
13. Although Dr. Lieberman supported plaintiff's claim of multiple chemical sensitivities caused by her employment, he acknowledged that many of plaintiff's symptoms were as likely to have been caused by chronic fatigue syndrome. When questioned more specifically, Dr. Lieberman stated that there was "a great similarity" between fibromyalgia, chronic fatigue syndrome and neurotoxicity.
14. Plaintiff also came under the care of Dr. Scott Barton, neuropsychologist. Dr. Barton diagnosed plaintiff as having an Axis I mental disorder due to chronic exposure to toxic chemicals. He also diagnosed her with major depressive episodes and cyclothymia, a mild form of manic depression. Dr. Barton further opined that due to plaintiff's episodes of disorientation, fatigue and mental confusion, that she is unable to work.
15. However, Dr. Barton was also of the opinion that plaintiff had significant psychological difficulties prior to any harmful exposure to chemicals. On cross examination, Dr. Barton stated that he has never been presented with any evidence showing that any of the chemicals plaintiff alleges to have used at the salon were ever in her body. He also agreed that there were many other causes, including emotional distress, that could be the cause of plaintiff's problems.
16. A chemical profile was run on plaintiff at Durham Regional Hospital. It reflected normal readings and confirmed that no chemicals with which plaintiff worked in the hair salon were found in her system.
17. Dr. June Van Bruggen, a psychiatrist, diagnosed plaintiff with hypomania and depression which related back to her childhood.
18. Plaintiff was treated by Dr. Patrick Logue, a psychologist, in the Fall of 1994. Dr. Logue noted plaintiff's reports of numerous instances when her symptoms became acute. He also noted that during the Fall of 1993, plaintiff became depressed, fearing that she would lose her business. In addition to her depression, plaintiff also experienced feelings of sadness, hopelessness, and of being overwhelmed, all of which led to irregular sleeping patterns. Dr. Logue also noted that plaintiff had begun regular psychotherapy sessions as a result of this depression in December of 1993.
19. Dr. Logue administered a series of psychological tests, including the WAIS-R, Laterality Questionnaire, Trial Making Test, Controlled Verbal Fluency Examination, Wisconsin Card Sorting Test, Controlled Figural Fluency Examination, Grooved Pegboard, Aphasia Screening Test, Russell Revised Wechsler Memory Scale, Associate learning, Levin Selective Reminding Test, 2 7 Continuous Performance Test, MMPI, and NCSE. In summarizing these test results, Dr. Logue was of the opinion that the results of plaintiff's neuropsychological testing were not consistent with a pattern associated with toxin exposure. In particular, the MMPI, which was administered in order to assess plaintiff's current level of psychological functioning, reflected significant psychological overlay and semantic sensitivity along with unusual sensory experiences and a tendency to deny psychological distress. Dr. Logue further opined that plaintiff's alleged memory deficits and the absence of the visuospatial deficits were not consistent with a toxin exposure profile.
20. Dr. Adams is a Board Certified Specialist in the area of Occupational Medicine who was asked to evaluate the cause of plaintiff's condition and her ability to work. Dr. Adams has diagnosed and treated patients for MCS even though there is some controversy in the medical community about the existence of this condition. Dr. Adams reviewed the medical notes and depositions of Dr. Lieberman and Dr. Barton, as well as the Material Safety Data Sheets on the chemicals involved in this case and medical records. He evaluated plaintiff on 7 May 1995 and obtained a history from plaintiff. Plaintiff reported that she had worked as a cosmetologist for approximately thirty (30) years and that she felt her exposure to chemicals in the workplace caused her numerous symptoms and conditions.
21. Dr. Adams conducted a physical examination, the results of which were normal. Dr. Adams conducted a mental status examination, the results of which were also normal. Dr. Adams noted that plaintiff had several pre-existing conditions which consisted of depression and hypomania. In Dr. Adams' opinion, plaintiff did have symptoms of MCS or environmental illness but, he could not relate plaintiff's symptoms to any work related chemical exposure. He found no documentation in the records demonstrating unusual exposure levels to chemicals or that there were high levels of organic compounds in plaintiff's blood stream. Dr. Adams specifically noted that Dr. Lieberman's records and testimony lacked documentation showing chemicals used in plaintiff's workplace to be in her system. Dr. Adams was of the opinion that he needed verification that the chemicals used by plaintiff were present in her system in order to give the opinion that plaintiff's MCS was related to her work.
22. Dr. Adams' final diagnosis was depression and symptoms of increased susceptibility to multiple chemicals of which the cause is unknown. Dr. Adams opined that plaintiff's employment did not place her at an increased risk of developing multiple chemical sensitivity syndrome as compared to members of the general public.
23. Plaintiff has an extensive pre-existing history prior to 1993 of numerous similar physical and mental symptoms which were unrelated to her employment. All chemicals used in plaintiff's hair salon business were approved and fell within OSHA standards as noted on the Material Safety Data Sheets.
24. The Full Commission, in examining the evidence as a whole, gives greater weight to the testimony of Dr. Adams than to that of Dr. Lieberman and Dr. Barton. Dr. Adams found no causal connection between plaintiff's MCS and her employment.
26. Plaintiff's symptoms could have been caused by a number of other conditions or factors other than exposure to chemicals at work. There is no objective documentation of disablement due to chemical exposure at work. There is also no circumstantial evidence of disablement due to chemical exposure at work. Plaintiff was undoubtedly exposed to numerous chemicals in the workplace during a significant period of the workday for over 30 years. Plaintiff's exposure to chemicals at work was greater than that of the general public. However, plaintiff has not proven by the greater weight of the evidence that her employment significantly contributed to the development of, or materially aggravated her current symptoms and conditions.
27. Defendants' Form 19, represents that plaintiff's average weekly wage on 16 October 1993 was $500.00.
***********
Based on the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove by the greater weight of the evidence that her exposure to chemicals in her employment caused, materially aggravated or significantly contributed to the development of her MCS and other conditions. N.C. Gen. Stat. § 97-53 (13).
2. Plaintiff is, therefore, entitled to no compensation under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53 (13).
************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Each side shall pay its own costs.
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
S/_____________ LAURA K. MAVRETIC COMMISSIONER